# EXHIBIT 1

# RDM MCA LOAN AGREEMENT



# MASTER RECEIVABLES PURCHASE AGREEMENT
## (WEEKLY)

This Purchase Agreement ("Agreement") is made and entered into as of <u>May 3, 2024</u>, by and between RDM Capital Funding, LLC DBA FinTap, a New Jersey limited liability company located at 777 Passaic Ave, suite 375, Clifton, NJ 07012 (hereafter "Buyer"), as Buyer, and <u>Gray Harbor LLC</u> DBA <u>Gray Harbor Digital</u> located at <u>359 96th Street STE 203, Stone Harbor, NJ 08247</u> (hereafter "Seller"), as Seller, with an email address at <u>bretth@grayharbordigitial.com</u>.

## SCHEDULE OF PURCHASED RECEIPTS

| | |
|---|---|
| **Purchase Price:** (The dollar amount that Buyer is paying for the Amount Sold of Seller's Future Receivables.) | $375,000.00 |
| **Amount Sold:** (The dollar value of the Receipts being sold.) | $521,250.00 |
| **Purchased Percentage:** (The percentage of Receipts Seller agrees to remit to Buyer on a weekly basis.) | 2.32% |
| **Weekly Amount:** (The dollar amount to be collected from Seller's Account once each week that represents an estimate of the average monthly sales x Purchased Percentage / 4 weeks in average calendar month, subject to reconciliation or adjustment.) | $11,847.00 |
| **Origination Fees:** (Fees for costs incurred in underwriting and paying certain additional compensation to referral sources. Shall be deducted from the initial advance of the Purchase Price.) | $14,062.50 |

## PURCHASE AND SALE OF RECEIPTS

1. **Sale of Receipts.** Seller agrees to sell to Buyer, in consideration of the Purchase Price as specified in the Schedule of Purchased Receipts, the Amount Sold, the Purchased Percentage of the proceeds of Seller's accounts receivables and payment rights arising out of or relating to Seller's sale or deliver of good or services due to Seller after the date of this agreement, whether paid directly by Seller's customers or paid by others on Seller's customers' behalves or as reimbursements ("Receipts"), including amounts due from Seller's credit card processor (hereafter "Processor"), which shall be remitted by Seller to Buyer each week until the Amount Sold is delivered in full in accordance with Section 2. In consideration for the Amount Sold, Buyer will deliver to Seller the Purchase Price, shown above, minus any fees shown above. Delivery of the Purchase Price by Buyer shall constitute its acceptance of the terms of this Agreement, even if it does not sign the Agreement. Seller acknowledges that it has no right to repurchase the Amount Sold from Buyer.

2. **Collection of Receipts; Collection Authorization.** In lieu of calculating the Purchased Percentage of Receipts each week, Buyer will collect each week the Weekly Amount of the Receipts specified in the Schedule of Purchased Receipts, representing a good faith estimate by Buyer and Seller of the Purchased Percentage of Receipts, subject to reconciliation or adjustment in the manner set forth in Section 9. Except as otherwise agreed in writing between the parties, Buyer agrees to accept the remittance of the Weekly Amount by debiting the Seller's designated bank account into which Seller shall deposit all of its Receipts (the "Account"). Seller understands that this authorization is a fundamental condition to induce Buyer to enter into this Agreement. If furtherance thereof, Seller irrevocably authorizes Buyer or its designated successor or assignee to withdraw the Weekly Amount by initiating a debit via the Automated Clearing House (ACH) system or any other electronic means, or any other means deemed appropriate to debit entries to the Account, and shall execute the accompanying Authorization Agreement for Automated Clearing House Transactions ("ACH Authorization"). In the event that Buyer withdraws erroneously from the Account, Seller shall promptly notify Buyer of the same and hereby authorizes Buyer to credit the Account for the amount erroneously withdrawn.

3. **Fees.** Seller shall pay all fees and charges allowable under this Agreement together with all of the fees and charges set forth on the Fee Structure Addendum, attached hereto as **Exhibit A** and incorporated by reference immediately upon assessment. In addition, Buyer may upon prior notice to Seller change any of the fees or charges under this Agreement and/or under the Fee Structure Addendum.

4. **Notice of Insufficient Funds or No Receipts.** In the event that Seller's Account does not have adequate funds available to cover the Weekly

Amount to be delivered to Buyer or or that or Seller has, or anticipates having, no Receipts or substantially diminished Receipts (either temporarily or for a longer period), Seller shall provide twenty-four (24) advance notice to Buyer hours advance notice (or such other reasonable notice as necessitated by the circumstances), but in no event shall Seller delay provide notice of insufficient funds or no (or limited) Receipts to Buyer for more than two days after Seller becomes aware of such circumstances or receives notice of a rejected debit. Notice may be in writing or by telephone. If Seller fails to provide notice in accordance with this paragraph, Buyer may assess the NSF Fee set forth in the Fee Structure Addendum per each occurrence.

5. **Seller's Representations, Warranties and Covenants.** Seller represents, warrants and covenants the following as of this date, and at all times during the course of this Agreement:

   a    Seller is a business entity that has been validly formed and is in good standing under the laws of the jurisdiction(s) in which it is organized and/or operates. Seller is a business that regularly accepts payments by credit cards, checks or other methods as a means by which its customers pay Seller for amounts due for goods and services.

   b    Seller possesses and is in compliance with all permits, licenses, approvals, consents and other authorizations necessary to conduct its business. Seller is in compliance with any and all applicable federal, state, and local laws and regulations. Seller possesses all requisite permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

   c    Seller shall conduct its business consistent with past practice and shall use the Purchase Price, whether the funding of such Purchase Price occurs contemporaneous with the execution of this Agreement or anytime time thereafter, solely for business purposes and none will be used for personal, household or consumer purposes. Seller and Buyer hereby acknowledge and agree that none of the parties to or guarantor of this Agreement is a "consumer" with respect to this Agreement and underlying transaction, and neither this Agreement nor any guarantee thereof shall be construed as a consumer transaction.

   d    Seller acknowledges that it is entering into this Agreement in the ordinary course of its business and that the remittances to be made from Seller to Buyer under this Agreement are being made in the ordinary course of Seller's business. Nothing in this Agreement to the contrary, Seller shall operate its business in good faith and do nothing to intentionally cause the diminution of the Receipts or diversion of any portion of the Receipts from the Account without Buyer's written permission, which permission shall not be unreasonably withheld. This provision is to ensure collectability of the portion of the Receipts purchased by Buyer.

   e    Any and all credit card processing terminals and/or point of sale systems shall be approved by Buyer and programmed to process only through a Buyer-approved Processor.

   f    Each financial record, statement, books and records or other documents Seller has provided to Buyer in connection with Buyer's assessment of this transaction, either before or after the execution of this Agreement, is to Seller's knowledge true and accurate. If any information has since or will come to Seller's attention that materially affects the truth or accuracy of such documents, Buyer shall immediately provide written notice of the same to Seller.

   g    Except as otherwise disclosed in writing to Buyer, Seller has good, complete and marketable title to all Receipts and all collateral in which Buyer has been granted a security interest under this Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of Buyer, or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Buyer. Seller has not entered into any other agreement for the sale or encumbrance of Receipts and/or merchant cash advance agreement except as disclosed to Buyer in writing. Seller shall not enter into any other sale or encumbrance of any portion of its Receipts and/or merchant cash advance agreement, without advance notice to Buyer.

   h    Seller represents, warrants, and covenants that it has good, complete, and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of Buyer, other than any for which Buyer has actual or constructive knowledge or which have been disclosed to Buyer by Seller as of the date of this Agreement.

   i    Seller represents, warrants, and covenants that it will not enter into with any party other than Buyer any arrangement, agreement, or commitment that relates to, involves or would result in a lien upon the Receipts, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without advance notice to Buyer.

   j    Seller shall not sell, dispose, convey or otherwise transfer its business or assets without advance notice to Buyer. If Seller remains a going concern and/or continues to generate Receipts, such transfer shall not be made without the written consent by Seller and the assumption of all of Seller's obligations under this Agreement by the purchaser or transferee of the business or assets pursuant to documentation reasonably satisfactory to Buyer.

   k    Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Amount Sold, Seller will not voluntarily close its business for renovations, repairs or any other purposes. This provision, however, does not prohibit Seller from closing its business (i) if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or (ii) if otherwise forced to close by circumstances not reasonably in the control of Seller. Prior to any closure, Seller will provide Buyer advanced written notice.

   l    Seller shall furnish Buyer with the bank statements for its Account and any and all other accounts to which proceeds from Seller's Receipts are deposited within two (2) days of any such request by Buyer.

m     Seller's execution of and/or performance under this Agreement will not cause or create an event of default by Seller under any contract with another person or entity.

n     Seller shall not attempt to revoke its ACH Authorization to Buyer set forth in this Agreement or otherwise take any measure to interfere with Buyer's ability to collect the Weekly Amount or any other amount Buyer is otherwise entitled to receive from either Seller or Processor.

o     The Account shall be one that is established and used for business purposes only and not for personal, family, or household purposes. Seller shall not commingle funds in the account which are for personal, family or household purposes.

p     Seller shall not close the Account or change the bank account into which Processor deposits the Receipts to another account without advance notice to Buyer and Seller's execution of a new ACH Authorization in Buyer's favor for the new account.

q     Except as otherwise disclosed in writing to Buyer, there are no pending lawsuits, arbitrations, judgments and/or claims against Seller, including without limitation any in which the subject matter is, or a lien is placed upon, the Receipts.

r     Seller shall not conduct its businesses under any name other than as disclosed to Buyer, or change any of its places of business, or change the type of business it conducts without advance notice to Buyer and entry into documentation satisfactory to Buyer to ensure that the receipts generated by Seller shall continue to be remitted to Buyer.

s     Seller represents that the information it furnished Buyer in this Agreement and preceding application, including, without limitation, Seller's processing statements, is true and accurate in all respects and fairly represents the financial condition, result of operations and cash flows of Seller at such dates, and since the dates therein, there has been no material adverse change in the business or its prospects or in the financial condition, results of operations, or cash flows of Seller.

t     As of the date of this Agreement, Seller does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Nothing herein shall prevent Seller from filing a petition for bankruptcy protection or make any voluntary or involuntary bankruptcy filing an event of Default under this Agreement where such filings are necessitated by circumstances unknown or unforeseen as of the date of Seller's entry into this Agreement.

u     The person who signed this Agreement on behalf of Seller is authorized by Seller to sign this Agreement on behalf of Seller.

v     Seller shall provide Buyer with viewing access to the Account and shall not take any action to block Buyer's viewing access. Seller must provide updated login information for the Account within 24 hours of the change.

w     The following covenants are intended to ensure the collectability of the portion of the Receipts purchased by Buyer as they are generated and shall not be construed as modifications of the above provisions that Buyer has purchased only the Purchased Percentage of the Receipts as a contingent purchase of receivables:

- Seller, without written notice to Buyer, shall not: (i) take any action to discourage the use of electronic check or credit or debit card processing that is settled through Processor or the Account, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Seller's services and products; (ii) change its arrangements with Processor or the bank at which the Account is located in any way that is adverse or unacceptable to Buyer; (iii) change the processor through which the Receipts are settled from Processor to another processor, or permits any event to occur that could cause diversion of any of Seller's check, credit card, debit card or deposit transactions to another processor.

- Seller, without the written consent of Buyer, shall not: (i) intentionally interrupt the operation of its business or transfer, move, sell, dispose, divert or otherwise convey its business and/or assets (including its customers or receivables) without (1) the express prior written consent of Buyer, and (2) the written agreement of any purchaser or transferee to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer; (ii) take any action, fails to take any action, or offer any incentive (economic or otherwise) the result of which will be to induce any of Seller's customers to pay for Seller's goods or services with any means other than payments, checks or deposits that are settled through Processor or deposited in the Account; (iii) fail to remit its receivables into the Account; (iv) open another account at a financial institution other than the bank at which the Account is located, or opens another account at the bank at which the Account is located and into which account Seller diverts deposit of its Receipts or any portion thereof; (v) close the Account, block the Account or make any other material changes to the Account that would prevent Buyer from debiting the Account; (vi) purport to revoke the ACH Authorization; or (vii) block Buyer's viewing access to the Account, including by changing its log-in credential or otherwise;

- Seller shall not fail to provide financial documents or other information requested by Buyer including, without limitation, copies of any documents related to Seller's credit card or payment processing activity or financial and banking affairs within two (2) days after a request from Buyer.

In the event that Seller changes its Buyer-approved Account without advance notice to Buyer and entry into a new ACH Authorization for the new account in favor of Buyer, Seller shall, in addition to paying any other damages suffered by Buyer, pay to Buyer the Default Fee set forth in the Fee Structure Addendum.

x     Seller understands that: (i) the foregoing representations, warranties and covenants of Seller are a fundamental condition to induce Buyer to enter into this Agreement; (ii) Buyer is relying on these representations, warranties and covenants of Seller in entering into this Agreement; and (iii) Buyer would not make any payment of any Purchase Price to Seller hereunder if any of the foregoing

representations, warranties and covenants were not accurate.

6. **No Agency Relationship Created.** Unless otherwise disclosed, Buyer is an entirely separate and independent entity from the Processor and the irrespective agents. Buyer does not have any power or authority or control over Processor's actions with respect to the processing of Seller's credit card transactions. Neither Processor or Buyer are the agent for the other, neither is authorized to waive or alter any term or condition of this Agreement and their representations shall in no way affect Seller's or Buyer's rights and obligations set forth herein.

7. **Nonrecourse Sale of Receipts; No Right to Repurchase; and Non-Consumer Transaction.** THIS IS NOT A LOAN. Seller and Buyer agree that the Purchase Price paid by Buyer in exchange for the Amount Sold of Receipts as set forth in the Schedule of Purchased Receipts is for the purchase and sale of the Purchased Percentage of the Receipts up to the Amount Sold, is a true sale of receipts and is not intended to be, nor shall it be construed as, a loan or an assignment for security from Buyer to the Seller. Hence, there is no interest rate or fixed payment schedule and no time period during which the Receipts must be collected, or the Amount Sold realized, by Buyer.

   a  Absent a written modification between the parties, and absent an event of Default the total amount paid by Seller to Buyer will never exceed the Amount Sold (plus any applicable fees as set forth in this Agreement). If Receipts are remitted more slowly than Buyer may have anticipated or projected or if the full Amount Sold is never received by Seller due to adverse changes to or the termination of Seller's business or otherwise, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of, or Default under, this Agreement. Buyer is buying the Amount Sold of Receipts knowing the risks that Seller's business may not perform as expected, go bankrupt or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement and the financial and business information previously provided by Seller.

   b  The period of time over which it will take Buyer to collect the full Amount Sold is not fixed, is unknown to both parties as of the date of this Agreement and will depend on how well or poorly Seller's business performs hereafter. As an extreme example, in the event Seller's business ceases to exist after Buyer's purchase of the Receipts and prior to the delivery of the full Amount Sold as a result of a cessation of revenues for reasons outside Seller's control, Buyer may never collect all or a substantial portion of the Amount Sold.

   c  By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Percentage of the Receipts as they are created or received, and the Receipts shall be held in trust in favor of Buyer, and Seller retains no legal or equitable interest therein. Payments made to Buyer in respect of the Amount Sold shall be conditioned upon Seller's sale of products and services, and the payments therefor by or on behalf of Seller's customers. Buyer is a bona fide purchaser of the Amount Sold for fair value. Seller agrees that the Purchase Price equals the fair market value for the risk undertaken by Buyer in consideration for the Amount Sold of Receipts.

   d  Seller agrees that it will treat the Purchase Price and Amount Sold in a manner consistent with a sale in its accounting records and tax returns, and not as a loan. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance.

   e  Seller hereby appoints Buyer, and Buyer accepts appointment, as servicer for and on behalf of Seller for the purpose of collecting and delivering Receipts to Buyer as required by this Agreement until Buyer has received the Amount Sold, and Seller agrees that all such Receipts shall be received and held in trust for the benefit of Seller for purposes of performing the terms of this Agreement.

   f  Because the parties acknowledge and rely upon the lawfulness of this transaction under the laws of the State of New York and the fairness of its terms, Seller knowingly and willingly waives and is estopped from asserting any claim or defense of usury in any legal action or proceeding, whether based on New York law or the law of any other jurisdiction.

   g  Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, any such disclosure by Buyer does not change the intention of the parties that the transaction evidenced by this Agreement is not a loan and does not have an interest rate.

8. **Adjustments/Reconciliations.** The Weekly Amount is derived from an estimate of the Purchased Percentage of Seller's expected Receipts for each calendar month and is subject to adjustment in the event of a material change in the amount of Receipts. A request for adjustment of the Weekly Amount may be made by either Buyer or Seller, in accordance with this Section. While there is no set term for the delivery of the Receipts under this Agreement, any adjustment will have the effect of shortening or lengthening the time period over which Receipts are actually delivered. In the event that as a result of the remittances of the Weekly Amount Seller has overdelivered more than the Purchased Percentage of Seller's Receipts since the effective date of this Agreement (such as because there has been a diminution of the actual Receipts), Seller shall have the right to request a reconciliation so that Buyer shall return to Seller such amounts as may exceed the then currently realized amount of the Purchased Percentage of Receipts. It shall be Seller's sole responsibility to request a reconciliation, if it is required.

   a  Adjustment Requests by Seller. As long as there has not been a Default under this Agreement, if there has been a material change in the Seller's Receipts, Seller may give written notice to Buyer by email to info@fintap.com, requesting that Buyer conduct a review in order to ensure that the Weekly Amount collected by Buyer more closely approximates the Purchased Percentage of the actual average Receipts, and if an adjustment to the Weekly Amount is required Buyer shall adjust in accordance with this Section. A request for an adjustment by Buyer may be made upon five (5) days written notice by email to Seller, and requesting that Seller provide the login and password for Seller's Account and any bank statements (or month-to-date banking information), merchant statements, and similar documents as may be necessary to reconcile the amounts received or to be received by Buyer with the Purchased Percentage of Receipts. In order to effectuate this review, Seller must produce with its request the login and password for Seller's Account and any bank statements (or month-to-date banking information), merchant statements, and similar documents as may be necessary to adjust the amounts received or to be received by Buyer with the Purchased Percentage of Receipts. Upon receipt of a proper written request from Seller that requires an adjustment, Buyer shall make the adjustment within two (2) business days of Seller's request and provision of the financial information, which shall be effective as of the date of the notice (such that any overpayment by Seller after the date of the notice shall be credited to Seller). After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the

        Weekly Amount until any subsequent adjustment. Buyer shall not be required to adjust the Weekly Amount until such time as it has received all such requested information. Any adjustment may substantially extend the duration of this Agreement. Nothing herein limits the timing and number of times that such a reconciliation may be requested.

   b     **Adjustments by Buyer.** If Buyer desires a reconciliation, then upon 5 calendar days written notice to Seller, Buyer may adjust the Weekly Amount so that the amount received by Buyer in the future will more closely approximate the then average monthly Receipts of Seller.

   c     **Reconciliations.** As long as there has not been a Default under this Agreement, if there has been a material downward change in the Seller's Receipts such that it reasonably appears to Seller that the total amount collected from Seller by Buyer through debits of the Weekly Amounts materially exceeds the Purchased Percentage of Seller's Receipts since the effective date of this Agreement, Seller shall have the right to request a reconciliation so that Buyer shall return to Seller such amounts as may exceed the then currently realized amount of the Purchased Percentage of Receipts. It shall be Seller's sole responsibility to request a reconciliation, if it is required. Seller may request an adjustment at any time and for as many times as it desires during the course of the Agreement by sending Buyer a request by email to info@fintap.com, and including a copy of Seller's bank statements or statements from any credit card payment processor since the effective date of this Agreement (which statements shall also include the Seller's bank account report showing transactions in the month to date), as well as any receivables reports maintained by Seller. Upon receipt of a written reconciliation request from Seller, Buyer may request any and all financial information of the same nature (i.e., showing the Receipts) from Seller as is reasonably necessary to accurately reconcile the amount Buyer has received from Seller with the actual total amount of Receipts generated by Seller since the effective date. Buyer shall review Seller's actual Receipts for the entire period between the effective date and the date of the request and, in the event the total amount remitted exceeds the total Purchased Percentage of the Receipts actually received by Seller for such period, Buyer shall remit back to Seller any amount overcollected. The reconciliation shall be made within five (5) business days of Seller's request and provision of the financial information described in this Section and shall be effective as of the date of the notice. Any reconciliation may substantially extend the duration of this Agreement. Buyer shall not be required to reconcile the Specific Amount until such time as it has received all such requested information.

   d     Nothing set forth in Section shall be deemed prevent Seller from requesting a stop or reduction to the Weekly Amounts in the event of an immediate and drastic reduction or cessation of its Receipts.

9. **Power of Attorney.** Seller irrevocably appoints Buyer as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Seller from any bank or Processor, or in the case of an occurrence of an event of Default under Section 14 hereof, to Buyer under this Agreement, including without limitation (i) to collect monies due or to become due under or in respect of any of the Amount Sold; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause i above; (iii) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Buyer; (iv) to file any claims or take any action or institute any proceeding that Buyer may deem necessary for the collection of any of the undelivered Receipts up to the Amount Sold, or otherwise to enforce its rights with respect to payment of the Amount Sold (in connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Seller and Buyer is authorized to use Seller's funds to pay for same); and (v) to have the right, without waiving any of its rights and remedies and without notice to Seller or any Owner/Guarantor, to notify any credit card processor of the sale of Receipts and redirect the remittance of daily settlements to an account of Buyer's choosing in order to settle all obligations due to Buyer under this Agreement.

10. **DACA.** At any time prior to Seller's delivery of the Amount Sold to Buyer, Buyer may request, and Seller shall execute, a Deposit Account Control Agreement (DACA) for the Account in a form acceptable to Seller's bank, by which Seller shall grant non-invoked control of the Account to Buyer, maintaining Seller's access to the Account unless and until there is a Default, at which Buyer may invoke control of the Account.

11. **Updated Credit Reports.** Seller and each of the Owners signing below authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners, (ii) obtain consumer and business credit reports on the Seller and any of its owners or principals, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller continues to have any obligation owed to Buyer this Agreement. In the event that Seller requests additional or renewal funding from Buyer, Seller authorizes Buyer to use the financial information, credit reports, or updated credit reports obtained in connection with this Agreement to determine Seller's eligibility to enter into such further funding agreement with Buyer.

12. **Electronic Transactions Authorization.** Each document that is subject to or provided in furtherance of this Agreement, as amended, modified or supplemented from time to time that a party has sent to the other by electronic means or the Seller has clicked to approve to adopt this Agreement shall be intended as and constitute an original and deemed to contain a valid signature for all purposes acknowledging and consenting to the terms of the agreement applicable thereto. In furtherance of the above, Seller hereby authorizes Buyer to regard the Seller's printed name or electronic approval for any document, agreement, assignment schedules or invoices as the equivalent of a manual signature by one of Seller's authorized officers or agents. Buyer may rely upon, and assume the authenticity of, any such electronic approval, and any material applicable to such approval as the duly confirmed, authorized and approved signature of the Seller by the person approving same, shall constitute an "authenticated" record for all purposes (including, without limitation, the UCC) and shall satisfy the requirements of any applicable statute of frauds. Seller is not required to agree to conduct business pursuant to ESRA and the purchase of Receipts in furtherance of this Agreement is not conditioned upon Seller agreeing to conduct business in accordance with the ESRA. Seller has the option to request paper copies of any electronic records upon written request to Buyer. Seller may terminate this Electronic Transactions Authorization by providing Buyer with not less than ten (10) days written notice in conformity with this Agreement.

13. **Default.** A "Default" under this Agreement shall include, but not be limited to, any of the following events: (a) Seller intentionally interferes with Buyer's right to collect the Purchased Percentage or Weekly Amount; (b) the breach by Seller of any covenants, terms or conditions

contained in this Agreement, including without limitation those set forth in Section 5; (c) any representation or warranty made by the Seller in this Agreement or Seller's application for this Agreement is incorrect, false or misleading; (d) Seller or any guarantor sends Buyer a notice of termination of this Agreement or any guaranty prior to remittance of the entire Amount Sold; (d) Seller voluntarily ceases operations or changes the location of its business without notice to Buyer of such change in location; (e) Seller voluntarily transfers or sells all or any substantial portion of its assets without notice to Buyer; (f) Seller or its principals, directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Seller; (g) on five (5) or more cumulative occasions prior to Buyer's regularly scheduled debit of the Weekly Amount from the Account, , Seller fails to provide notice to Buyer that there will be insufficient funds in the Account such that the debit of the Weekly Amount will not be honored by Seller's bank or that or Seller has, or anticipates having, no Receipts or substantially diminished Receipts (either temporarily or for a longer period); (h) Seller prevents Buyer from collecting any part of the Amount Sold (for example, if Seller's bank returns a code other than one for Not Sufficient Funds (NSF) when declining Buyer's attempts to debit Merchant's account, except if the code indicates that a debit is declined because of an act of the bank or a third-party outside of Seller's control); or (i) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer.

14. **Remedies.**

    a   In the event of a Default, Buyer shall be entitled to all remedies available at law and equity. The Purchased Percentage shall equal 100% of the Receipts. In addition to all other remedies, Buyer is entitled under the Agreement and by operation of law or equity, in the event of Seller's Default, to collect the full uncollected Amount Sold plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately and without notice to Seller, and Buyer may: (a) enforce the provisions of the personal guaranty of performance; (b) proceed to protect and enforce its rights and remedies by arbitration or lawsuit; (c) automatically debit Seller's Account for all amounts due to Buyer without notice to Seller; (d) debit any amounts due to Buyer by ACH from the Account; (e) exercise any and all rights and remedies as a secured party under Article 9 of the Uniform Commercial Code. Neither failure on the part of Buyer to exercise, nor any delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity and shall survive termination of this Agreement.

    b   In the event that Seller fails to provide timely notice to Buyer an attempt by Buyer to debit the Account is rejected, or if any remittance Weekly Amount is missed for whatever reason that does not constitute a Default per Section 13, Buyer has the right to elect to, without notice, convert the remittance schedule from weekly payments to daily payments, with said daily payments to be calculated as the Weekly Amount divided by five (5) ("Daily Amount"). If Buyer elects to make this conversion, all references to the Weekly Amount herein shall be deemed to read Daily Amount and Section 13(g) shall be modified such that a Default will occur if Seller fails to give due notice on five (5) or more occasions. All other terms and conditions shall remain the same.

15. **Default Fee.** Upon the occurrence of any payment Default hereunder, Buyer shall be entitled to charge and Seller shall pay the Default Fee set forth on the Fee Structure Addendum as liquidated damages to cover the increased costs associated with administering the Default.

16. **Security Interest.** To secure Seller's obligations under this Agreement to make available or deliver the purchased Receipts to Buyer and Buyer's right to realize the Purchased Receipts Amount , as and to the extent required by the terms of this Agreement, and performance of and compliance by Seller with its other undertakings and agreements herein, Seller hereby grants to Buyer a security interest in all Seller's now existing and hereafter arising or existing accounts and all proceeds thereof (together, the "Collateral").

    a   This pledge will secure all of Buyer's rights under this Agreement and any other agreements now existing or later entered into between Seller and Buyer. Seller will obtain from Buyer written consent prior to granting a security interest of any kind in the Collateral to any third party and any such grant of a security interest without advance notice to Buyer shall be null and void. Seller agrees to execute any documents or take any action in connection with this security interest as Buyer deems necessary to perfect or maintain Buyer's first priority security interest in the collateral, including the execution of any account control agreements.

    b   Seller hereby authorizes Buyer to file any financing statements deemed necessary or desirable by Buyer to perfect or maintain its security interest without prior notice to Seller. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Receipts or Buyer's right to collect same.

    c   Upon any Default (as defined below), Buyer may pursue any remedy available at law (including those available under the provisions of the Uniform Commercial Code ("UCC")), or in equity to collect, enforce or satisfy any obligations then owing to Buyer against the Collateral without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. Buyer shall have the right to notify account debtors at any time. Pursuant to Article 9 of the UCC, as amended from time to time, Buyer has control over and may direct the disposition of the Collateral. For avoidance of doubt, this security pledge shall not (i) permit Buyer to collect the Amount Sold the event that Seller itself is not required to remit it, such as for the reasons set forth in in this Agreement, or (ii) otherwise affect the contingent nature of this transaction.

    d   Upon the full performance by Seller of Seller's obligations under this Agreement, the security interest in the Collateral shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Buyer will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

    e   In the event Seller, or any of its officers or directors, during the term of this Agreement or while Seller remains liable to Buyer for any obligations under this Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to

be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Seller, such entity shall be deemed to have expressly assumed the obligations due Buyer under this Agreement. With respect to any such entity, Buyer shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. Buyer shall be held harmless by Seller and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. Buyer shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of Buyer's rights, including without limitation, Buyer's right to collect all accounts, and to notify any credit card processor or creditor of such entity that Buyer has such rights in such entity's assets. Seller also agrees that, at the Buyer's discretion, Buyer may choose to amend any existing financing statement to include any such newly formed entity as debtor.

17. **Sharing of Information.** Seller hereby authorizes Buyer to share information regarding Seller's performance under this Agreement with affiliates and unaffiliated third parties.

18. **Indemnification.** Seller will indemnify and hold harmless Buyer and its officers, directors, principals, partners, members, employees, agents, representatives and affiliates (each being an "Indemnified Party") from and against any and all losses, claims, actions, damages and liabilities, joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, made by any third party or otherwise (including, without limitation, any customer or client of Seller), relating to or in connection with this Agreement, the collection of any Receipts, the rejection or revocation of merchandise or disputes with respect to any services of every kind and nature by any customer or client of Seller and the performance by such Indemnified Party under this Agreement, and Seller will reimburse any Indemnified Party for all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) as they are incurred in connection with the investigation of, preparation for or defense of any pending or threatening claim, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. Seller further indemnifies and holds harmless the Processor(s), and their member banks, and the Buyer, and their respective officers managers, owners, affiliates, employees, agents and representatives (the "Indemnitees" ) from and against any and all losses, damages, claims, liabilities and expenses, including, but not limited to, attorney's fees incurred by any of the Indemnitees arising from: (i) actions taken in reliance upon information or instructions provided to the Buyer and/or the Processor(s) and their member banks by or on behalf of Seller; or (ii) the occurrence of termination of this Agreement. In no case will the Indemnitees be liable for any claims asserted against them based on any theory of law or equity for lost profits, revenues, or business opportunities; exemplary, special or consequential damages, each of which is hereby expressly waived by Seller. However, in the event that any Indemnitee shall be found liable, damages shall not, under any circumstances, exceed the Amount Sold pertaining to the Schedule(s) of Purchased Receipts for which the underlying claim(s) arise(s). The provisions of this Section shall survive the termination of this Agreement.

19. **Notices.**

    a  <u>Notices from Buyer to Seller</u>. Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

    b  <u>Notices from Seller to Buyer</u>. Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address at RDM Capital Funding, LLC DBA FinTap, 777 Passaic Ave, suite 375, Clifton, NJ 07012. Notices sent to Buyer shall become effective only upon receipt by Buyer.

20. **Binding Effect; Assignment.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights or interests hereunder without the prior written consent of Buyer, which consent may be withheld at Buyer's sole discretion. Buyer may assign this Agreement without notice to Seller.

21. **Buyer's Costs of Enforcement, Attorney's Fees.** Buyer shall be entitled to receive or recover from Seller and Seller shall pay to Buyer all of Buyer's reasonable attorney's fees, costs and expenses incurred in enforcing any of the terms of this Agreement, regardless of whether or not a legal action has been commenced, including, without limitation, relating to any out of court workout, receivership, assignment for benefit of creditors or bankruptcy involving the Seller or any guarantor. Buyer's entitlement hereunder shall include, without limitation, collection agency fees or attorneys' fees (which may include a contingency fee of up to forty percent (40%) of the outstanding Amount as of the earlier of a Default or the commencement of such proceeding), expert witness fees and costs of suit. Attorneys' fees, costs and expenses recoverable hereunder shall include such as may be incurred in making of an applications for reimbursement to the court or arbitrator (so-called "fees on fees") and on appeal. . This provision shall survive termination of this Agreement.

22. **Cancellation.** The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any fees listed on the Schedule of Purchased Receipts. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the business bank account designated in the ACH authorization agreement signed on the date of this Agreement and as it may be amended or replaced from time to time and the ability to withdraw the Weekly Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial. If the Seller cancels this Agreement prior to the initial funding, Seller will be charged the Cancellation Fee set forth on the Fee Structure Addendum and the Cancellation Fee will be debited via ACH from the Seller's Account. Seller will also be charged the Cancellation Fee if Buyer cancels the Agreement due to Seller's fraud.

23. **Term of Agreement.** This Agreement for the purchase and sale of Receipts does not have a fixed duration or term, making the term potentially infinite. The term of this Agreement shall commence as of the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when Buyer delivers the Purchase Price to Seller. This Agreement shall expire on either (a) the date when the Amount Sold and all other sums

due to Buyer are received by Buyer in full, as per the terms of this Agreement, or (ii) provided Seller is not in Default, the date of the total failure of Seller's business and the complete cessation of all of its Receipts.

24. **Modifications Amendments; Entire and Final Agreement.** This Agreement, together with Exhibit A, the Personal Guaranty of Performance, the ACH Authorization and any other addendums executed together herewith, contain the entire and final agreement and understanding between the parties, and supersede and replace all prior negotiations and proposed agreements, written or oral. Each of the parties hereto acknowledges that no other party or any agent of any other party or any broker or independent sales office has made any promise, representation or warranty whatsoever, express or implied, written or oral, not contained in this Agreement to induce any person to execute this Agreement. This Agreement may not be waived, altered, modified, revoked or rescinded except by a writing signed by the parties' executive officers. No attempt at oral modification or rescission of this Agreement and the documents given in contemplation hereof or any term of any of the foregoing will be binding upon the parties.

25. **Severability.** In case any one or more of the provisions contained in this Agreement or the documents given in contemplation hereof is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

26. **Governing Law; Venue; Service of Process.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Buyer so elects, be instituted in any state court sitting in New York (the "Acceptable Forums"). Seller and any guarantors agree that the Acceptable Forums are convenient to them, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. Seller and any guarantors waive the right to remove any action or proceeding to federal court or to transfer such proceeding to a venue other than the Acceptable Forums. Should such proceeding be initiated in any other forum, Seller and any guarantors waive any right to oppose any motion or application made by Buyer to dismiss such proceeding, to remove and/or transfer such proceeding to an Acceptable Forum, and for an anti-suit injunction against such proceeding (which Buyer may but is not required to make in the Acceptable Forums). Additionally, Seller and any guarantors waive personal service of any summons and/or complaint or other process to commence any litigation and agree that service of such documents shall be effective and complete if mailed by certified mail or by email, to the address(es) listed on page 1 of this Agreement or in the guaranty. Service shall be deemed complete upon mailing in accordance with this Section. Seller and any guarantors will then have 30 calendar days after the date of mailing in which to respond.

27. **Headings Solely For Convenience.** Headings to sections of this Agreement are solely for convenience, are not to be deemed part of the Agreement, and are not to be used to interpret or construe any provision of the Agreement.

28. **Counterparts; Facsimile; Scans.** This Agreement may be executed in identical counterparts and shall constitute a binding contract between Buyer and Seller when Buyer and Seller exchange executed counterparts and said exchange may be made by facsimile or scan of same sent via email.

29. **Monitoring, Recording, and Solicitations.**

    a   <u>Authorization to Contact Seller by Phone.</u> Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications. To the maximum extent permitted by law, Seller and agrees that any call between Seller and Buyer or Buyer's agents and employees may be recorded or monitored.

    b   <u>Authorization to Contact Seller by Other Means.</u> Seller also agrees that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

30. **Statute of Limitations.** Seller and any guarantor agree that notwithstanding any other statute of limitations or repose or tolling under state or federal law (including any statute permitting equitable recoupment), there shall be shall be a one (1) year statute of limitations from the date of accrual of a cause of action or defense with respect to the filing or interposing of any claim, defense suit, action or proceeding by Seller or any guarantor that arises out of or relates to this Agreement, the transaction contemplated herein, or the interpretation, performance of breach hereof. If such a claim is filed more than one (1) year after accrual it shall be time-barred, regardless of the nature of the cause of action, right or remedy. This provision does not apply to claims by Buyer against Seller or any guarantor.

31. <u>**JURY WAIVER:**</u> **THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

32. <u>**CLASS ACTION WAIVER:**</u> **BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION (INCLUDING WITHOUT LIMITATION IN ANY ARBITRATION PROCEEDING IN ACCORDANCE WITH THE NEXT SECTION), EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR**

*[Initialed: BH]*

COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVEACTION.

33. **ARBITRATION**: ANY PARTY TO THIS AGREEMENT AND ANY GUARNATOR SHALL HAVE THE RIGHT TO REQUEST THAT ANY DISPUTE, CONTROVERSY OR CLAIM BETWEEN BUYER AND SELLER AND ANY GUARANTORS, WHETHER ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT OR OTHERWISE (INCLUDING WITHOUT LIMITATION CLAIMS FOR FRAUD, MISREPRESENTATION, INTENTIONAL TORT, NEGLIGENT TORT OR UNDER ANY LOCAL, STATE OR FEDERAL STATUTE OR RULE), AND WHETHER OR NOT SUCH DISPUTE IS ALREADY PENDING BEFORE A COURT, BE SUBMITTED TO ARBITRATION BEFORE MEDIATION AND CIVIL ARBITRATION INC. D/B/A RAPIDRULING, IN ACCORDANCE WITH ITS COMMERCIAL ARBITRATION RULES. THE ARBITRATION SHALL BE DEEMED TO TAKE PLACE IN NEW YORK, NEW YORK, REGARDLESS OF THE LOCATION OF THE PARTIES, AND MAY PROCEED VIRTUALLY OR REMOTELY TO THE EXTENT PERMITTED UNDER THE ARBITRATOR'S RULES. THE ARBITRATION SHALL BE GOVERNED BY THE NEW YORK CIVIL PROCEEDINGS LAW AND RULES (CPLR). ALL QUESTIONS CONCERNING ARBITRABILITY SHALL BE DECIDED BY THE ARBITRATOR. A PARTY WISHING TO ARBITRATE MAY DEMAND THAT SUCH DISPUTE BE SUBMITTED TO ARBITRATION EITHER BY (I) SENDING A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES IN ACCORDANCE WITH THE NOTICE PROVISION OF THIS AGREEMENT, OR (II) SENDING A WRITTEN NOTICE OF INTENT TO ARBITRATE TO THE ATTORNEY OF RECORD FOR SELLER OR ANY GUARANTOR WHO HAS BROUGHT ANY ACTION OR PROCEEDING BEFORE ANY COURT OR TRIBUNAL AGAINST BUYER. INITIALLY, THE PARTIES WILL SPLIT THE ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR FEE. THE ARBITRATOR MAY AWARD TO THE PREVAILING PARTY ITS ATTORNEYS' FEES AS WELL AS ITS SHARE OF THE ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR FEE. SELLER AND ANY GUARANTOR MAY OPT OUT OF THIS ARBITRATION PROVISION BY SENDING BUYER A NOTICE THAT HE, SHE OR IT DOES NOT WANT THIS PROVISION TO APPLY WITHIN FOURTEEN (14) DAYS AFTER THE EFFECTIVE DATE OF THIS AGREEMENT.

34. Seller certifies that it has read this Agreement, and has consulted with all necessary advisors, attorneys, accountants or other business and financial advisors, and relies solely upon this Agreement for its understanding of its nature, terms and conditions.

The entity or individual signing for Seller below agrees that he/she/ has read, understood and agrees to abide by the terms of this Agreement including those terms contained in the Fee Structure Addendum attached hereto and incorporated by reference as Exhibit A.

Dated: 05/03/2024          Signature: _____Brett Houck_____
                                       2D0F291003E7494...

                           Print Name: BRETT HOUCK

                           Print Title: OWNER

Agreement of Each Owner:

                           (Signature): _____Brett Houck_____
                                        2D0F291003E7494...

                           **RDM Capital Funding, LLC DBA FinTap.**     RDM Capital Funding, LLC DBA FinTap
Dated: 05/03/2024          By: _____Ian Goldberg_____              777 Passaic Ave, Suite 375
                                    C8F6778976B84A8...                  Clifton, NJ 07012
                           Print Name: IAN GOLDBERG

                           Print Title: CHIEF RISK OFFICER



# EXHIBIT A

## FEE STRUCTURE ADDENDUM

This Fee Structure Addendum is made part of and incorporated by reference into that certain Master Receivables Purchase Agreement dated May 3, 2024 between RDM Capital Funding, LLC DBA FinTap as Buyer and Gray Harbor LLC as Seller (the "Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

In addition to all of the fees and charges set forth in the Agreement, Seller agrees to pay Buyer on demand the fees and charges set forth in this Fee Structure Addendum. Buyer is authorized by Seller to initiate electronic or debit entries through the Automated Clearing House ("ACH") or other wire transfer service as applicable from the designated Account set forth in the Agreement to assess any of the fees and charges listed herein or referenced in the Agreement.

Not-Sufficient-Funds Fee - $50.00 per occurrence.

Rejected ACH fee - $100.00 per occurrence in the event that Seller directs the designated Account to reject Buyer's debit ACH, in addition to all other rights and remedies available to Buyer.

Default Fee - The greater of $5,000.00 and of an amount equal to fifteen percent (15%) of the Amount Sold outstanding in the aggregate attributable to the Schedule of Purchased Receipts, which is intended to cover increased expenses for collections of the Amount Sold by Buyer after a Default.

UCC Filing Fee - $195.00 to cover the cost of filing UCC-1 Financing Statement in connection with the Agreement.

Seller agrees that he/she has read, understood and agrees to abide by the terms contained in this Fee Structure Addendum.

**SELLER(S):**

Signature: _____ /s/ Brett Houck _____
Print Name: BRETT HOUCK

Print Title: OWNER

Agreement of Each Owner:

(Signature): _____ /s/ Brett Houck _____

---

RDM Capital Funding, LLC DBA FinTap     Page | 10     Seller's Initials  BH     Seller's Initials _____     Seller's Initials _____

# PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of <u>May 3, 2024</u> by <u>Brett Houck</u> (the "Guarantor"), <u>with an address at 359 96th Street STE 203, Stone Harbor, NJ 08247, and email address at bretth@grayharbordigitial.com</u>, for the benefit of RDM Capital Funding, LLC DBA FinTap ("Buyer"). Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Purchase Agreement (as hereinafter defined).

## RECITALS

A   Pursuant to that Purchase Agreement (the "Agreement"), dated of even date herewith, between Buyer and

<u>Gray Harbor LLC</u> ("Seller"), Buyer has purchased Receipts of Seller.

B   Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance to Buyer of all of the obligations of Seller; and

C   Guarantor will directly benefit from Buyer and Seller entering into the Agreement.

## AGREEMENT

As an inducement to Buyer to purchase the Receipts identified in the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

1. **Defined Terms:** All capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

2. **Guaranty of Obligations:** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of Seller's obligations under the Agreement, including full and timely performance by Seller of each and all of the representations, warranties, obligations and covenants made in the Agreement, including the Seller's full and timely delivery of the Receipts pursuant to (and limited by) the Agreement, in each case as each Agreement may be renewed, amended, extended or otherwise modified. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain either performance or payment for such default from Seller or any other guarantor.

3. **Guarantor's Other Agreements:** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any Receipts of Seller without the prior written consent of Buyer, which may be withheld for any reason. Guarantor hereby agrees to pay all costs and attorney's fees incurred by Buyer in connection with any actions commenced by Buyer to enforce its rights or incurred in any action to defend its performance under the Agreement and this Guaranty. This Guaranty is binding upon Guarantor, and Guarantor's heirs, legal representatives, successors and assigns. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified that a negative credit report reflecting on his/her credit record may be submitted to a credit reporting agency if the terms of this Guaranty are not honored by the Guarantor. Guarantor expressly consents to conduct business by electronic means.

4. **Waiver:** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. Buyer does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Guaranty if it is not notified of: (i) Seller's failure to timely deliver any amount under the Agreement; (ii) any adverse change in Seller's financial condition or business; (iii) OPV's acceptance of this Guaranty; and (iv) any renewal, increase, extension or other modification of the Agreement or Seller's other obligations to Buyer. In addition, Buyer may renew, extend or otherwise modify the Agreement or Seller's other obligations to Buyer. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller or any other guarantor for any amounts paid by Guarantor, or acts performed by Guarantor, under this Guaranty: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

5. **Acknowledgment of Purchase:** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Amount Sold is a purchase of the Amount Sold and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller. Guarantor knowingly and willfully waives any claims or affirmative defenses that might otherwise be available to Seller, including without limitation bad faith, unjust enrichment, usury, duress, unconscionability, unfair business practices, consumer protection statutes, champerty, contract of adhesion or fraud (including fraud in the inducement of this Guaranty), except for the defense of payment. Guarantor acknowledges the Purchase Price paid to Seller is good and valuable consideration for the sale of the Amount Sold of Receipts.

6. **Governing Law; Venue; Service of Process:** This Guaranty shall be governed by and construed in accordance with the laws of the State of New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Buyer so elects, be instituted in any state court sitting in New York (the "Acceptable Forums"). Guarantor agrees that the Acceptable Forums are convenient to them, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. Guarantor waives the right to remove any action or proceeding to federal court or to transfer such proceeding to a venue other than the Acceptable Forums. Should such proceeding be initiated in any other forum, Guarantor waives any right to oppose any motion or application made by Buyer to dismiss such proceeding, to remove and/or transfer such proceeding to an Acceptable Forum, and for an anti-suit injunction against such proceeding (which Buyer may but is not required to make in the Acceptable Forums). Additionally, Guarantor waives personal service of any summons and/or complaint or other process to commence any litigation and agree that service of such documents shall be effective and complete if mailed by certified mail, with a courtesy copy by email, to the address(es) listed above or for Seller in the Agreement. Service shall be deemed complete upon mailing in accordance with this Section.

*[Initialed: BH]*

Guarantor will then have 30 calendar days after the date of mailing in which to respond.

7. **JURY WAIVER:** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

8. **CLASS ACTION WAIVER:** BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

9. **ARBITRATION:** BUYER SHALL HAVE THE RIGHT TO REQUEST THAT ANY DISPUTE, CONTROVERSY OR CLAIM BETWEEN BUYER AND GUARANTOR, WHETHER ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS GUARANTY OR OTHERWISE (INCLUDING WITHOUT LIMITATION CLAIMS FOR FRAUD, MISREPRESENTATION, INTENTIONAL TORT, NEGLIGENT TORT OR UNDER ANY LOCAL, STATE OR FEDERAL STATUTE OR RULE), BE SUBMITTED TO ARBITRATION BEFORE (I) THE AMERICAN ARBITRATION ASSOCIATION IN ACCORDANCE WITH ITS COMMERCIAL RULES, OR (II) MEDIATION AND CIVIL ARBITRATION INC. D/B/A RAPIDRULING, IN ACCORDANCE WITH ITS COMMERCIAL ARBITRATION RULES. THE ARBITRATION SHALL BE DEEMED TO TAKE PLACE IN NEW YORK, NEW YORK, REGARDLESS OF THE LOCATION OF THE PARTIES, AND MAY PROCEED VIRTUALLY OR REMOTELY TO THE EXTENT PERMITTED UNDER THE ARBITRATOR'S RULES. THE ARBITRATION SHALL BE GOVERNED BY THE NEW YORK CIVIL PROCEEDINGS LAW AND RULES (CPLR). ALL QUESTIONS CONCERNING ARBITRABILITY SHALL BE DECIDED BY THE ARBITRATOR. BUYER MAY DEMAND THAT SUCH DISPUTE BE SUBMITTED TO ARBITRATION EITHER BY (I) SENDING A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES IN ACCORDANCE WITH THE NOTICE PROVISION OF THIS AGREEMENT, OR (II) SENDING A WRITTEN NOTICE OF INTENT TO ARBITRATE TO THE ATTORNEY OF RECORD FOR GUARANTOR WHO HAS BROUGHT ANY ACTION OR PROCEEDING BEFORE ANY COURT OR TRIBUNAL AGAINST BUYER. INITIALLY, THE PARTIES WILL SPLIT THE ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR FEE. IF BUYER PREVAILS IN ARBITRATION, THE ARBITRATOR MAY AWARD TO BUYER ITS ATTORNEYS' FEES AS WELL AS ITS SHARE OF THE ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR FEE. GUARANTOR MAY OPT OUT OF THIS ARBITRATION PROVISION BY SENDING BUYER A NOTICE THAT HE, SHE OR IT DOES NOT WANT THIS PROVISION TO APPLY WITHIN FOURTEEN (14) DAYS AFTER THE EFFECTIVE DATE OF THIS AGREEMENT.

10. **Severability:** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

11. **Opportunity for Attorney Review:** The Guarantor represents that it has carefully read this Guaranty and has, or had a reasonable opportunity to, consult with its attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as its free act and deed.

12. **Counterparts and Facsimile Signatures:** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

Owner 1 -

Guarantor (Print Name): BRETT HOUCK

Signature: _/s/ Brett Houck_

# AUTHORIZATION AGREEMENT
# FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

<u>Gray Harbor LLC</u> ("Seller") hereby authorizes RDM Capital Funding, LLC DBA FinTap ("Buyer") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to Buyer from Seller under the terms of that Agreement for the Purchase Agreement (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. Seller also authorizes Buyer to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement.

Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller authorizes Buyer to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute an event of default under the Agreement. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this authorization.

Transfer Funds To/From:    Name of Bank: ▮▮▮▮▮▮▮▮
                           ABA Transit/Routing #: ▮▮▮▮▮▮▮▮
                           Checking Account #: ▮▮▮▮▮▮▮▮

This authorization is to remain in full force and effect until all amounts due to Buyer under the Agreement have been paid in full, in such time and in such manner as to afford Buyer a reasonable opportunity to act on it.

Seller Information:

Seller's Name: <u>Gray Harbor LLC</u>
Signature: _____*Brett Houck*_____ (DocuSigned by: 2D0F291003E7494...)
Print Name: <u>BRETT HOUCK</u>
Title: <u>OWNER</u>

Seller's Tax ID: ▮▮▮▮▮▮▮▮
Date: <u>05/03/2024</u>



## ADDENDUM TO SECURED MERCHANT AGREEMENT
## FOR DISCOUNTED PURCHASED AMOUNT

WHEREAS RDM Capital Funding LLC d/b/a FinTap ("FinTap") and Gray Harbor LLC ("Merchant") are parties to the Master Receivables Purchase Agreement, dated May 3, 2024 (the "Agreement"); and

WHEREAS, Merchant requested that FinTap permit Merchant to fully satisfy the Purchased Amount of $521,250.00 if Merchant delivers to FinTap the Purchased Amount minus a discounted amount in a shorter period than Merchant would otherwise deliver the Purchased Amount by making remittances of the Daily or Weekly Amounts;

NOW, THEREFORE, it is agreed as follows:

1. Definitions. Except as otherwise defined in this Addendum, all capitalized terms have the same meaning as in the Agreement.

2. Discounted Purchased Amount. Without modification or waiver of any other term of the Agreement, as an accommodation to Merchant, Merchant may fully satisfy Merchant's obligation to deliver the Purchased Amount by delivering to FinTap a Discounted Purchased Amount prior to the last day of any of the Time Frames following the Effective Date of the Agreement set forth in the graph below. A Discounted Purchased Amount is calculated as the full Purchased Amount minus the applicable Discount Amount for the Time Frame in which it is delivered by Merchant.

| Time Frame | Discount Amount | Discounted Purchased Amount |
|---|---|---|
| 30 days | $56,250.00 | $465,000.00 |
| 60 days | $37,500.00 | $483,750.00 |
| 90 days | $18,750.00 | $502,500.00 |

EACH OF THE UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS ADDENDUM

FOR THE MERCHANT (#1)

Signature: _Brett Houck_ (DocuSigned)
Print Name: BRETT HOUCK
Print Title: OWNER

RDM Capital Funding, LLC DBA FinTap　　　　　　Page | 14　　Seller's Initials _BH_　　Seller's Initials _____　　Seller's Initials _____

# EXHIBIT 2

# LIST OF CASES FINDING MCA AGREEMENTS TO BE LOANS

<u>NY Decisions Re: MCA Agreements are Loans</u>

*See Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, *3 (2d Cir. June 8, 2023); *B & T Supplies, Inc. v. GemJ Chehebar Grat, LLC*, 2024 U.S. Dist. LEXIS 230826, *3031 (S.D.N.Y. Dec. 20, 2024); *Lateral Recovery LLC <u>v. Funderz.Net,</u> LLC*, 2024 U.S. Dist. LEXIS 176985 (S.D.N.Y. Sept. 27, 2024); *Lateral Recovery, LLC v. Funderz, LLC*, 2024 U.S. Dist. LEXIS 10134 (S.D.N.Y. Jan. 19, 2024); *Haymount Urgent Care P.C., v. GoFund Advance LLC*, 2022 U.S. Dist. LEXIS 112768 (S.D.N.Y. 2022); *Lateral Recovery LLC v. Queen Funding LLC<u>,</u>* 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913 (S.D.N.Y. 2022); *Fleetwood Services LLC v. Ram Capital Funding LLC*, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207 (S.D.N.Y., 2022); *Lateral Recovery, LLC v. Cap. Mech. Servs. LLC.*, 632 F. Supp. 3d 402 (S.D.N.Y. 2022); *Davis v. Richmond Capital Group LLC*, 194 AD3d 516, 150 NYS3d 2 (1st Dep't 2021); *LG Funding, LLC v United Senior Properties of Olathe*, LLC, 181 AD3d 664, 122 N.Y.S.3d 309 (2d Dep't 2020); *Crystal Springs Capital, Inc. v. Big Thicket Coin*, LLC, 220 A.D.3d 745 (N.Y. 2d Dep't 2023); *Oakshire Props., LLC v. Argus Capital Funding, LLC*, 229 A.D.3d 1199 (N.Y. 4th Dep't 2024); *HI Bar Capital LLC v. Parkway Dental Servs., LLC*, 2022 N.Y. Misc. LEXIS 5814, 2022 NY Slip Op 32934(U) (Kings Cty. Aug. 25, 2022); *Akf, Inc. v. Haven Transp. Bus. Sols., Inc.*, 2024 U.S. Dist. LEXIS 103271, *18-19 (N.D.N.Y. June 11, 2024); *MCA Servicing Co. v. Nic's Painting, LLC*, 2014 N.Y. Misc. LEXIS 2238,

\*12 (N.Y. Sup. Ct. Apr. 23, 2024); *Cloudfund, LLC v. Mobile Rehad, Inc.*, 2024 N.Y. Misc. LEXIS 4817, \*12 (N.Y. Sup. Ct. May 1, 2024); *NRO Boston Llc v. Yellowstone Capital LLC*, 72 Misc. 3d 267, 275, 147 N.Y.S.3d 375, 383 (Sup. Ct. 2021); *McNider Mar., LLC v. Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165, \*10-12 (Sup. Ct. Nov. 19, 2019); *see also FTC v. Braun*, 2024 U.S. Dist. LEXIS 20535, \*31 (S.D.N.Y. Feb. 6, 2024).